UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| GORDON D. WARMAN, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 7-97-B-W |
| | ) |
| JAMES GIOIA, et al., | ) |
| | ) |
| Defendants | ) |

**RECOMMENDED DECISION**

Gordon Warman has brought suit against James Gioia, a Gardiner police officer, James Toman, the Chief of the Gardiner police, and the City of Gardiner claiming that all three defendants violated his constitutional rights in connection with Officer Gioia's response to a mental health crisis involving Warman. Toman and the City of Gardiner have moved for summary judgment on the complaint claiming that the undisputed facts establish that there can be neither supervisory nor municipal liability imposed in this case. (Docket No. 15.) Gioia does not seek summary disposition of the case, as the facts surrounding Gioia's use of force against Warman are clearly in dispute. I now recommend the court grant the motion as to both the City of Gardiner and Chief Toman.

*Discussion*

*A. Summary Judgment Standard*

"At the summary judgment stage," the United States Supreme Court explained in Scott v. Harris, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." __ U.S. __, __, 127 S. Ct. 1769, 1776 (2007) (citing Fed. Rule Civ. Proc. 56(c)). Scott reemphasized, "'[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial."'" Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). Warman cannot defeat summary judgment by relying on "'conclusory allegations, or rank speculation.'" Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 224 (1st Cir. 2007) (quoting Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 55 (1st Cir. 2006)).

*B. Material Facts*

On September 29, 2005, Evonne Barter tried to prevent Gordon Warman, her boyfriend at the time, from hurting himself by requesting professional mental health intervention from Crisis in Counseling in Augusta, Maine. (SAMF ¶ 32.) Barter was advised by Crisis in Counseling to contact the Gardiner Police Department, which she did by calling "911" or the Department directly.[1] (SAMF ¶ 33.) She called the Gardiner Police Department because Warman was causing harm to himself with a blade.

At the relevant times, Officer James Gioia was a police officer for the Gardiner Police Department. James Toman is the Police Chief for the City of Gardiner Police Department and is a graduate of the Maine Criminal Justice Academy. In response to a

---

[1] Defendants object to this statement as inadmissible hearsay, but the record citation supports that Evonne Barter contacted the police after speaking with the Crisis in Counseling people. I do not take this as a hearsay statement offered in support of the truth of any matter asserted. Evonne Barter, as the deponent, clearly has personal knowledge of what she did and why she did it.

2

911 call, at approximately 8:34 p.m. on September 29, 2005, Officer Gioia reported to an apartment building at 93 Highland Avenue, Gardiner, Maine.  Officer Gioia initially came upon Warman when he was standing at the threshold of doorway of his apartment smoking a cigarette.  Officer Gioia could see blood on Warman's arms and a bloodied tissue in his hands.

According to Gioia he repeatedly requested that Warman show his hands and come outside into the driveway.  Warman qualifies that statement by noting that he did show his hands, complying with Gioia's request and that Warman asked him to walk outside to the driveway "at least twice."  (SMF ¶ 7, Resp. SMF ¶ 7.)  According to Gioia, Warman did not comply with this request and an altercation ensued.  Warman says he complied on the first request to show his hands and he was grabbed by Gioia unexpectedly when Warman turned to get his jacket and flip-flops in order to comply with the request to walk down the driveway.  (SMF ¶ 8;  Resp. SMF ¶ 8.)

Warman was barefoot, wearing only a tank-top and shorts when he was grabbed by Gioia, although Gioia qualifies this fact by replacing "grabbed" with the explanation that he took hold of Warman to lead him outside after he failed to comply with verbal requests that he step outside into the courtyard.  (SAMF ¶ 19; Resp. SAMF ¶ 19.)  There is no dispute that at no time was Warman attempting to flee the scene.

No other police officers were present at the scene at the time of the disputed contact between Gioia and Warman.  Gioia was aware that Warman was exhibiting signs of mental instability and would probably require a mental evaluation.  Gioia's efforts to verbally diffuse the situation were limited to his asking Warman to step down to the driveway.  (SAMF ¶ 22; Resp. SAMF ¶ 22.)  Gioia never warned Warman that he was

3

going to use force if Warman did not comply with the request to step down to the driveway.

Gioia received training at the Maine Criminal Justice Academy regarding the appropriate response for mental health calls and periodically he attended in-service training through the Gardiner Police Department. In his role as Police Chief, Toman required Gioia to receive training at the Maine Criminal Justice Academy, which includes protocol related to mental crises response. Toman also required Gioia to attend other mandatory classes designed or directed by the board of trustees of the Maine Criminal Justice Academy. Gioia says there are no facts in the record that indicate that he was improperly trained, but Warman points to two separate incidents where Gioia used or threatened to use deadly force against mentally disturbed persons to diffuse a mental health crisis, one occasion resulting in a mentally disturbed person being held at gunpoint and one resulting in a fatality. (SMF ¶ 13; Resp. SMF ¶ 13.)[2] As of November 7, 2007, Officer Gioia had never been reprimanded, cited, or in any other way investigated/disciplined for his conduct as a law enforcement officer.

As of September 29, 2005, the City had in effect a standard operating procedure pertaining to the use of force. Gioia is familiar with this policy and was trained as to its application. As of September 29, 2005, the City had in effect a standard operating procedure pertaining to response to people in mental health crisis. Gioia is familiar with this policy and was trained as to responding to people in mental health crisis at the

---

[2] Warman's additional facts at ¶ 24 set forth these two incidents. Defendants have qualified that statement by noting, first, it does not comply with District of Maine Local Rule 56 because the paragraph contains multiple statements of fact. They also note that the 2002 incident involving a mentally unstable person brandishing a knife occurred while Gioia was employed by the Hallowell Police Department and resulted in Gioia diffusing the situation and being awarded a commendation for his actions. The incident involving the death of the mentally unstable individual occurred after the incident giving rise to this case. Obviously, the exhibit, a newspaper article, is not appropriate record evidence. In any event, these two incidents are not directly relevant to the issues of supervisory and municipal liability raised by this motion.

MCJA. The circumstances under which police personnel will undertake a protective detention in order to assist a person in a mental health crisis get to a duly licensed physician or clinical psychologist without delay for evaluation or treatment are set forth in 34-B M.R.S. § 3682 and the Gardiner Police Department's standard operating procedure No. 3.7; the City of Gardiner would expect Gioia's actions to be consistent with these standards. (Resp. SAMF § 25.) The City of Gardiner's standard operating procedure No. 3.7, established standards for the creation and implementation of the Crisis Intervention Team (CIT). Standard operating procedure No. 3.7 required the Gardiner Police Department to have a CIT comprised of qualified officers to be deployed and handle individuals in mental health crisis and ensure proper disposition of individuals who come in contact with law enforcement while in crisis. (Resp. SAMF ¶¶ 26-27.)

Gioia's knowledge of the CIT as of September 2005 appears uncertain. Gioia was unable to state with certainty if Gardiner even had a CIT as of September 2005. (Resp. SAMF ¶ 28.) Gioia's deposition testimony as cited by the parties at 53:17- 54:18 summarizes his training regarding crisis intervention and must be read in its entirety. Essentially Gioia's "formal" crisis intervention training, as best he could recall, ceased after his training at the academy. Gioia did not recall receiving any training with Gardiner CIT officers prior to the September 2005 incident.

Gioia did not contact a CIT officer or a supervisor before he made physical contact with Warman. (SAMF ¶ 29.) Neither of the CIT trained officers were working at the time of the incident and Gioia's supervisor was occupied with another call at that time. (Resp. SAMF ¶ 29.) Chief Toman admitted that Gioia was supposed to have followed protocol and familiarize himself with available options including formal referral

5

to mental health counseling and involuntary commitment. (SAMF ¶ 30.) Chief Toman admitted that Gardiner's CIT team did no specific training for Gioia. (SAMF ¶ 31.) However, the City qualifies this statement by noting that Gioia was sent to the Maine Criminal Justice Academy which provided several blocks of training on how to deal with persons with mental illness and Gioia also received some unspecified in-house training after leaving the academy. (Resp. SAMF ¶ 31.)

C. *Supervisory Liability of Chief Toman*

A primary concern here is whether or not Chief Toman can be held liable in his supervisory capacity. A supervisor, "'may be found liable only on the basis of her own acts or omissions.'" Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989) (quoting Figueroa v. Aponte-Roque, 864 F.2d 947, 953 (1st Cir.1989)). "It must be shown that the supervisor's conduct or inaction amounted to a reckless or callous indifference to the constitutional rights of others." Id. That is, "indifference that rises to the level of being deliberate, reckless or callous, suffices to establish liability under § 1983." Id. "Finally, there must be 'an "affirmative link" between the street-level misconduct and the action, or inaction, of supervisory officials.'" Id. (citing Woodley v. Town of Nantucket, 645 F.Supp. 1365, 1372 (D. Mass 1986)). "This causation requirement can be satisfied even if the supervisor did not participate directly in the conduct that violated a citizen's rights; for example, a sufficient causal nexus may be found if the supervisor knew of, overtly or tacitly approved of, or purposely disregarded the conduct." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 582 (1st Cir. 1994).

On this factual record it is impossible to attach supervisory liability to Chief Toman. He had received no prior information to put him on notice regarding Gioia's tactics in

6

dealing with mentally disturbed individuals.  He was not involved in the incident in any way.  The only claim against him appears to be that he, as the police chief, did not insure that Gioia received training from the Gardiner CIT as required by the standards and policies of the City.  However, the undisputed evidence is that Gioia was certified by the Maine Criminal Justice Academy and had receiving training at that institution on this very issue.

### D.   *Municipal Liability of the City of Gardiner*

Liability can adhere to the City of Gardiner only to the extent that Warman can meet the Monell v. Dept. of Soc. Servs., 436 U.S. 658 (1978)/ City of Canton v. Harris, 489 U.S. 378 (1989) municipal liability standard.  See Bd. of County Comm'rs Bryan County v. Brown, 520 U.S. 397, 402-04 (1997).  "In an action pursuant to 42 U.S.C. § 1983, there can be no municipal liability under a respondeat superior theory." Fabiano v. Hopkins, 352 F.3d 447, 452 (1st Cir. 2003) (citing Monell, 436 U.S. at 690-95).  Instead, to establish liability against the City, Warman "must prove deprivation of a constitutional right by means of 'the execution of the government's policy or custom.'" Id.  (quoting Harris, 489 U.S. at 385 and citing Monell, 436 U.S. at 690-94).  There must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." Harris, 489 U.S. at 385.  "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Brown, 520 U.S. at 403-04 (citing Monell, 436 U.S. at 694).  "Similarly, an act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that

7

the relevant practice is so widespread as to have the force of law." Id. at 404 (citing Monell, 436 U.S. at 690-91, in turn citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68 (1970)).

Warman appears to base his claim on either the City's policy of failing to properly train its officers in how to handle encounters with mentally disturbed individuals or the City's practice of failing to follow their own protective detention policy or state law on the subject.

I will address the failure to train argument first. In my view Calvi v. Knox County, 470 F.3d 422, 430 (1st Cir. 2006) disposes of this issue. The First Circuit has held: "Showing that a single individual received inadequate training is insufficient for municipal liability to attach; the training program as a whole must be found faulty." Calvi, 470 F.3d at 429 (citing Harris, 489 U.S. at 390-91). There is absolutely no record evidence to support the allegation that the City's training program as a whole was faulty. The Court's analysis in Calvi is dispositive of Warman's failure to train claims against the City of Gardiner. There is no evidence in this case that the City's officers are inadequately trained on how to deal with persons in mental crisis. The record evidence establishes that City officers receive several units of training on this issue at the Maine Criminal Justice Academy and as the topic arises from time to time as part of in-service training. Nor is there any evidence the City was aware that the training was inadequate in any way, such as prior instances of similar conduct. Warman's reliance upon a prior incident involving Gioia when he worked for another police department is misplaced because the incident appeared to demonstrate how well Gioia had performed in diffusing a dangerous situation. Officer Gioia received a commendation for his handling of that

incident from his prior employer.  It could hardly constitute notice to the City of Gardiner of any deficiency in Gioia's training, just as an incident that had not yet happened at the time of this case could hardly serve to put the City on notice of training deficiencies.

Turning to Warman's second basis for municipal liability, the City's alleged practice of not following state law or its own standard operating procedures regarding mentally disturbed individuals, there is no record evidence to support the existence of any such practice.  As Warman points out in his memorandum (although not in the summary judgment record) Gardiner is located in close proximity to a major state mental health facility where institutionalized individuals reside.  If, as Warman suggests in his argument, this fact means that Gardiner law enforcement officers routinely encounter individuals who are mentally disturbed, then if there were a practice of failing to follow standard operating procedures and state law one would expect to find some examples of such instances in the summary judgment record.  No such evidence has been presented.

### *Conclusion*

On the record and for the reasons set forth above, I recommend that the Court grant the motion for summary judgment on Warman's claims against Chief Toman and the City of Gardiner as contained within count IV of the complaint (Docket No. 15).  This disposition would leave for future resolution Warman's claims against Officer James Gioia in counts I-III.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive

memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.


May 8, 2008.                                             /s/ Margaret J. Kravchuk
                                                         U.S. Magistrate Judge